UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 15-cv-80465-MIDDLEBROOKS

JOSEPH CHIARINO,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.
_____/

## OPINION AND ORDER

This is an action for negligence brought by Joseph Chiarino against the United States of America. Mr. Chiarino alleges the United States of America is liable under the Federal Torts Claims Act for failure to diagnose bladder cancer during Mr. Chiarino's treatment at various Veterans Affairs ("VA") facilities occurring from September 2012 through April 2013. On May 9, 2016, I held a bench trial at which time documentary and testimonial evidence were presented. Based on the evidence presented, I make the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

1. Mr. Chiarino is a veteran of the United States Air Force who served as a fighter jet mechanic and was honorably discharged in 1970. (J. Chiarino Testimony).

2. In September 2012, Mr. Chiarino began exhibiting gross hematuria, blood in his urine. (J. Chiarino Testimony; V. Chiarino Testimony).

3. On September 12, 2012, Mr. Chiarino contacted the VA, complaining of the hematuria. (Pretrial Stip. at 2). On September 16, 2012, Mr. Chiarino visited the emergency room at the VA center in West Palm Beach, Florida. The VA performed a CT scan without contrast of Mr. Chiarino's bladder ("September Scan"). (Yun Testimony; P's Ex. 1 at

122). The September Scan revealed a bladder diverticulum, an outpouching on the bladder. (Yun Testimony; P's Ex. 1 at 122). The September Scan did not reveal the presence of any stones in the bladder. (Yun Testimony; P's Ex. 1 at 122).

4. On September 20, 2012, the VA performed an ultrasound of Mr. Chiarino's bladder. (Yun Testimony). The ultrasound did not reveal any stones in the bladder. (Yun Testimony; P. Ex. 1 at 115). The VA then scheduled a consultation with a VA urologist. (P. Ex. 1 at 122).

5. On October 16, 2012, Mr. Chiarino met with Dr. Diaz, a urologist at the VA hospital. (Yun Testimony; J. Chiarino Testimony). Dr. Diaz ordered a urinalysis test and a cytology. (Yun Testimony). A cytology is a test of a patient's urine by which an examiner looks at cells that have shed from the bladder lining in order to check for the presence of bladder cancer. (Yun Testimony). The evidence does not indicate the cytology was ever performed. (Yun Testimony).

6. On November 5, 2012, Dr. Diaz performed a cystoscopy on Mr. Chiarino. (P. Ex. 1 at 345-46). A cystoscopy is a procedure where the doctor inserts a small rubber camera into the urethra to view the inside of the bladder. (Yun Testimony). In his description of the procedure, Dr. Diaz wrote:

> Upon entering the bladder, the bladder mucosa was normal. There was a large diverticulum on the left posterior wall and *stone pressing in there*. There were no mucosal lesions present. The bladder was scanned completely and we did not see any more stones. There were some calcifications on the surface of the prostate gland and the *prostate was friable, bled quite easily*.

(P. Ex. 1 at 345) (emphasis added). His diagnosis was that Mr. Chiarino had "benign prostatic hyperplasia" ("BPH") and a "bladder diverticulum with [a] stone." (*Id.*).

7. On January 8, 2013, Mr. Chiarino visited his primary care physician at the VA, Dr. Laurence Greenspoon, for his annual physical. The next day Mr. Chiarino reported to Dr. Greenspoon that he still had hematuria. (P. Ex. 1 at 87).

8. On January 9, 2013, Mr. Chiarino reported to Dr. Diaz that he still had hematuria. (Yun Testimony; P. Ex. 1 at 80).

9. On January 22, 2013, Mr. Chiarino called Dr. Diaz's office to inform him that Mr. Chiarino was exhibiting hematuria and dysuria (pain when urinating). (Yun Testimony; P Ex. 1 at 76). Dr. Diaz noted Mr. Chiarino "does have a friable prosatic urethra and a diverticulum with stone. Will start him on finasteride . . . . If bleeding does not subside will need to have cysto[scopy] and lithotripsy." (P Ex. 1 at 76). Finasteride is a medication used to prevent bleeding due to an enlarged prostate. (Kava Tesimony). A lithotripsy is a procedure used to break up stones. (Yun Testimony).

10. On February 6, 2013, Mr. Chiarino visited Dr. Diaz and informed Dr. Diaz that he never received the finasteride prescription. (P. Ex. at 74). Diaz noted: "Patient has dysuria and hematuria. Having some trouble emptying bladder and very anxious. [H]e never received proscar order on 1/22. . . . He needs proscar and Flomax." (*Id.*). Proscar is a medication similar to finasteride. (Kava Testimony).

11. On March 8, 2013, Mr. Chiarino called the VA complaining of testicle and groin pain. (J. Chiarino Testimony; P. Ex. 1 at 68-69).

12. On March 12, 2013, Mr. Chiarino went to the emergency room at the VA. (P. Ex. 1 at 65). He complained of "low abdominal pain, painful [sic] when voiding and bilateral groin pain radiating to the testicles . . . ." (*Id.*). The VA performed a CT scan with contrast ("March Scan"). The preliminary report—created by the radiologist working the night shift—found an "[i]ll-defined 2.5-cm crenulated lesion with central hypodensity

abutting the left bladder, question a collapsed bladder diverticulum." (P. Ex. 1 at 62); *see also* (Yun Testimony). The next day, on March 13, 2013, the daytime radiologist, Dr. Henry Stern, reviewed the March Scan and changed the preliminary report's conclusion, writing: "[a] suspicious osseous abnormality is not identified. . . . Again seen is a left-sided bladder diverticulum." (P. Ex. 1 at 295). The March Scan did not reveal the presence of any bladder stone. (Ammann Testimony).

13. On March 19, 2013, Mr. Chiarino called the VA complaining of abdominal pain. (P. Ex. 1 at 46-47). He was told to go to the emergency room. (*Id.*; J. Chiarino Testimony).

14. On March 21, 2013, Mr. Chiarino saw Dr. Greenspoon. (P Ex. 1 at 41). Dr. Greenspoon referred Mr. Chiarino to a psychologist. (J. Chiarino Testimony; P. Ex. 1 at 43).

15. On March 22, 2013, Mr. Chiarino saw a psychologist. (J. Chiarino Testimony; P. Ex. 1 at 32). The psychologist told Mr. Chiarino that his hematuria might be caused by stress in his life. (J. Chiarino Testimony).

16. On April 30, 2013, Mr. Chiarino called the VA reporting further pain and hematuria. Mr. Chiarino asked to see Dr. Diaz but was told that an appointment with Dr. Diaz was not available until August 2013. (J. Chiarino Testimony). The on-call VA nurse told Mr. Chiarino to go to the emergency room. (J. Chiarino Testimony; P. Ex. 1 at 30).

17. On May 8, 2013, Mr. Chiarino saw a private urologist, Dr. Patrick Hunter. Dr. Hunter performed a cystoscopy on May 21, 2013. (Yun Testimony; D. Ex. 11B at 3). During the cystoscopy, Dr. Hunter could not see the entire bladder as there was too much blood; he ordered a follow-up cystoscopy under anesthesia. (Yun Testimony).

18. On May 23, 2013, Dr. Hunter performed a cystoscopy under anesthesia. (Pretrial Stip. at 2). Dr. Hunter identified adema and swelling on the left side wall of the bladder. He was unable to see the left ureter orifice (the opening for the tube leading to a kidney) because

4

a tumor was covering the hole. (*Id.*). Dr. Hunter converted the procedure to a transurethral resection of bladder tumor ("TURBT"), and began shaving away the inside of the tumor. (*Id.*). Dr. Hunter also observed that the tumor had spread to the floor of the bladder. (*Id.*). A tissue biopsy was performed that revealed the presence of a high grade urothelial carcinoma in Mr. Chiarino's bladder. (Pretrial Stip. at 2-3). The tumor was approximately 7 centimeters. (Yun Testimony).

19. On June 28, 2013, Mr. Chiarino underwent a radical cystectomy, a procedure in which his bladder was removed and a "neobladder" was created from a portion of Mr. Chiarino's colon. (Pretrial Stip. at 3; Yun Testimony).

20. Since having the radical cystectomy, Mr. Chiarino has had multiple surgeries including a surgery to fix a small bowel obstruction and three hernia repairs. (J. Chiarino Testimony). Mr. Chiarino has had additional health problems, including incontinence and erectile dysfunction. (J. Chiarino Testimony; V. Chiarino Testimony). Since his surgery on June 28, 2013, Mr. Chiarino has not experienced a recurrence of his cancer. (Pretrial Stip. at 3).

21. On May 6, 2014, Mr. Chiarino and his wife, Vanessa Chiarino, attended an adverse event meeting at the VA in West Palm Beach. (P. Ex. 1 at 18). At the adverse event meeting, Dr. Albert M. Ammann told the Chiarinos that Dr. Stern incorrectly interpreted the March Scan. (Ammann Testimony).

22. On April 9, 2015, Mr. Chiarino brought the instant suit against the United States. (DE 1). I held a bench trial beginning May 9, 2016. Several experts testified. The experts each had impeccable credentials and were refreshingly candid with the Court. I commend them for their testimony.

a. Dr. Edward Yun testified on behalf of Mr. Chiarino. Dr. Yun is a board certified urologist from California. He testified that, at the time Mr. Chiarino first presented with hematuria, he would have suspected bladder cancer. This is based on the hematuria—which can be cause by bladder cancer. Additionally, Mr. Chiarino had multiple risk factors for bladder cancer including: age over 40[1]; male; history of smoking[2]; and exposure to chemicals based on military service—especially as an air force mechanic. He testified that a standard workup for gross hematuria includes: (a) a CT scan with and without contrast; (b) urine cytology; and (c) a cystoscopy. A CT scan without contrast is helpful to see certain objects in the bladder, such as stones. A CT scan with contrast—meaning a doctor uses a contrasting dye—is employed to find other objects such as tumors. Under a CT scan with contrast, tumors light up. He testified that a cytology is also part of the standard workup to determine whether there is cancer in the bladder.

b. Dr. Yun testified that Dr. Diaz should have conducted a CT scan with contrast in October 2012. He testified that Dr. Diaz was correct to order a cytology as well, but that Dr. Diaz improperly failed to follow up when the cytology was never conducted. Dr. Yun testified that, during the cytoscopy in November 2012 when Dr. Diaz saw what he believed to be a stone in the bladder, Dr. Diaz should have realized that it was not a stone because the ultrasound and the September Scan had not revealed the presence of any stones.[3] Thus, according to Dr. Yun, Dr. Diaz misdiagnosed a tumor in November 2012 as a bladder stone.

---

[1] Mr. Chiarino was born on February 11, 1947. (J. Chiarino Testimony).
[2] Mr. Chiarino quit smoking in 1989. (J. Chiarino Testimony).
[3] He also testified that a CT scan without contrast is extremely effective at identifying the presence of stones in the bladder. According to Dr. Yun, if the CT scan did not reveal a stone,

c. Dr. Yun also testified that a tumor's growth rate varies based on the individual tumor's biology as well as the patient's biology. However, he testified that Mr. Chiarino's progression of symptoms was consistent with normal tumor growth.

d. According to Dr. Yun, the tumor existed in November 2012 and was tiny. Had Dr. Diaz ordered the proper workup for hematuria, he would have caught the tumor when it was tiny, as Stage I cancer that was confined to the diverticulum. Mr. Chiarino would have had the option to remove it via a transurethral resection of bladder tumor ("TURBT") procedure. If the cancer had progressed to Stage II, where the cancer had invaded the bladder wall, Mr. Chiarino would have had a partial cystectomy—a procedure where only part of the bladder wall is removed. Had the VA caught the cancer in March 2013, when it would have likely still been Stage II cancer, Mr. Chiarino would still have had a partial cystectomy. Dr. Yun testified that by failing to catch the tumor earlier, Mr. Chiarino's cancer progressed to Stage III, in which the only treatment option was a radical cystectomy. Dr. Yun testified that the radical cystectomy resulted in numerous complications including the bowel obstruction, multiple hernias, and current incontinence and erectile dysfunction. Dr. Yun testified that these complications would likely not have occurred had Mr. Chiarino had a TURBT procedure or a partial cystectomy. Dr. Yun also testified that, although Mr. Chiarino has not had a resurgence of cancer since his radical cystectomy, he still faces a lower chance of survival as opposed to a patient whose cancer was found when it was Stage I or

---

then there most likely was no stone. Moreover, according to Dr. Yun, there is no evidence of a stone because nothing in Mr. Chiarino's patient history—aside from Dr. Diaz's cystoscopy report—indicates a stone was ever identified.

7

II. He testified that, for this type of cancer, Stage I survival rate for five years is 88%, Stage II survival rate is 63%, and Stage III survival rate is 46%.

e. Dr. Ammann also testified for Plaintiff. Dr. Ammann is a board certified radiologist who has worked at the VA since 2003. He testified that he reviewed the March Scan in preparation for the VA's adverse event meeting. He testified that hematuria can be caused by stones in the bladder but that, here, no stones were found. Dr. Ammann testified that Dr. Stern missed the tumor in March 2013. Dr. Ammann testified that he identified the tumor based on the March Scan. He testified that he showed the March Scan to three or four other radiologists, "cold," without any background information, and they all saw a tumor. He testified that this was a case of a "flat out miss." He also testified that the VA might have seen the tumor in September 2012, had the VA performed a CT scan with contrast.

f. Both Mrs. and Mr. Chiarino testified. They chronicled their multiple attempts, in trying to get a proper diagnosis at the VA. They testified regarding Mr. Chiarino's pain and their collective frustration during this process. They also testified regarding the significant recovery periods Mr. Chiarino underwent after his radical cystectomy and subsequent surgeries. They testified as to Mr. Chiarino's quality of life before and after the cystectomy. Mr. Chiarino testified that he was worried starting in September 2012 that he had bladder cancer, because his daughter-in-law's father had bladder cancer the year before and had the same symptoms. Mr. Chiarino testified that he told everyone he could at the VA, including Dr. Diaz, that he believed he had bladder cancer.

g. Dr. Bruce Kava, a professor of urology at the University of Miami, testified for the Government. Dr. Kava testified that a CT scan and ultrasound are not enough of a workup in cases such as this; a doctor should also conduct a cystoscopy, which is the gold standard diagnostic tool. He also agreed that the standard of care for a workup on hematuria includes a CT scan with contrast. Here, Dr. Diaz properly performed a cystoscopy and noted that Mr. Chiarino had a friable prosthetic urethra and a slightly large prostate, which created a propensity for bleeding. He testified that Dr. Diaz did not likely miss a tumor in the cystoscopy in November 2012. If Mr. Chiarino had a tumor in his bladder in November 2012, it would have metastasized—spread to other parts of the body. Here, the tumor did not spread beyond the bladder, thus it could not have been a tumor in November 2012. He testified that the cystoscopy was properly performed and that Dr. Diaz was likely viewing exactly what he described, a stone. It was likely that a stone was present in the diverticulum even though the CT scan without contrast and ultrasound did not reveal the presence of a stone: he concluded this based on the intervening time from the initial tests and the subsequent cystoscopy, as well as the possibility that it was a type of stone that would not have been revealed in a CT scan or ultrasound. He testified that the hematuria was likely caused by benign prostatic hyperplasia ("BPH"). He testified that he would have followed up in three to four months. Dr. Kava also testified that he reviewed the March Scan and found no evidence of a tumor.

h. Dr. Kava testified that he would have done some things differently, he would have ordered a cytology, he would have performed a CT Scan with contrast, and he would have had Mr. Chiarino return earlier to perform a second cystoscopy

9

after the hematuria continued. However, Dr. Kava testified that none of these changes would have made any difference: it is extremely difficult to catch bladder cancer at a stage where some form of cystectomy is not necessary. He testified that partial cystectomies do have a role in medicine, but they leave the rest of the bladder wall at risk for a high rate of recurrence of cancer. He also testified that the location of this tumor, near the ureter, would make a partial cystectomy technically difficult and could have led to kidney destruction and other complications, including bowel complications.

i. Dr. Kava testified that, when Mr. Chiarino was diagnosed in May 2013, he would have recommended Mr. Chiarino receive neoadjuvant chemotherapy prior to having his radical cystectomy, which would have given Mr. Chiarino even better odds of fighting the bladder cancer. However, Dr. Kava testified that regardless, Mr. Chiarino has a good prognosis. Since Mr. Chiarino has not yet had a recurrence of cancer, he is doing extremely well. He testified that the bottom line is nothing he would have changed about the VA doctors' performance would have made a difference.

j. Finally, Dr. Joseph Pizzolato, a doctor who works at Mt. Sinai medical center and specializes in medical oncology and hematology, testified for the Government. He testified that Mr. Chiarino should have been treated with neoadjuvant chemotherapy prior to having the radical cystectomy. He also testified that nothing the VA doctors could have done would have changed Mr. Chiarino's chances of survival because Mr. Chiarino has been cancer free after almost three years since his surgery. He testified that, after three years, there is greater than a 95% chance that Mr. Chiarino has been cured.

## II. CONCLUSIONS OF LAW

At trial, Mr. Chiarino claimed that the VA had a duty to Mr. Chiarino when he sought medical treatment. Mr. Chiarino argued the VA breached that duty on multiple occasions by: (1) failing to order a CT Scan with contrast when Mr. Chiarino presented with hematuria in October 2012; (2) failing to follow up to ensure a cytology was actually performed after it was ordered in October 2012; (3) improperly identifying a tumor as a stone during the cystoscopy in November 2012; (4) multiple failures to follow up with a cytology, CT Scan with contrast, or a second cystoscopy during the months after the first cystoscopy, where Mr. Chiarino continued to have hematuria and progressively worse symptoms; and (5) misdiagnosing the tumor in March 2013. Mr. Chiarino contends that any one of these failures constituted a breach of the duty of care, and caused Mr. Chiarino harm by letting his bladder cancer develop from Stage I or II, to Stage III. As a result, Mr. Chiarino suffered damages based on (a) reduced life expectancy and (b) being forced to have a radical cystectomy, which resulted in additional damages including several subsequent surgeries, and reduced quality of life—all of which would not have occurred had he been able to have a TURBT or partial cystectomy. Mr. Chiarino seeks $2,000,000 in damages.[4]

In response, the Government argued there was no breach of the duty of care—Dr. Diaz and the other VA doctors and workers met the standard of care. The Government also contended that Mr. Chiarino has not established that any breach of the duty of care caused Mr. Chiarino his

---

[4] It is unclear exactly how this figure was calculated. The Complaint states Mr. Chiarino seeks $2,000,000 for "[m]edical expenses incurred in the past, and medical expenses to be incurred in the future; pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, aggravation of a disease or physical defect, and loss of capacity for the enjoyment of life sustained in the past and to be sustained in the future." (Compl. at 6). In his proposed findings of fact, he lists $336,255.25 dollars "for the reasonable costs of necessary medical and health care, therapy, medications, supplies, required by his medical condition resulting from the occurrence in question from the date of trial to the date of his death." (DE 54 at 9). He seeks $1,650,000.00 "for past and future physical pain and suffering, past and future mental anguish, disability, disfigurement and past and future loss of the enjoyment of life." (*Id.*). At trial, Mr. Chiarino abandoned his claims for future medical expenses.

11

present injuries. According to the Government, any alleged delay in Mr. Chiarino's treatment would not have changed the end result: regardless of the VA's alleged breach, Mr. Chiarino would have had a radical cystectomy. Further, as Mr. Chiarino has not had a recurrence of cancer, he has had the best outcome possible. Any earlier catch of a tumor would not have lead to a better outcome. Finally, the Government contends that any difference in the outcome was caused by Mr. Chiarino or the private doctors he used. The Government argued Mr. Chairino was averse to surgery: that he did not want to have a cystoscopy after November 2012 and that he failed to see Dr. Diaz after February 2013. The Government also contended that any reduction in Mr. Chiarino's survival rate would be attributable to his choice to not have neoadjuvant chemotherapy.

"The Federal Tort Claims Act was designed to provide redress for ordinary torts recognized by state law." *Stone v. United States*, 373 F.3d 1129, 1130 (11th Cir. 2004) (internal quotations omitted). As the alleged tort occurred in Florida, Florida tort law applies. *Id.* In Florida, "[t]he elements of a medical malpractice action are: (1) a duty by the physician, (2) a breach of that duty, and (3) causation." *Saunders v. Dickens*, 151 So. 3d 434, 441 (Fla. 2014). A plaintiff must prove each of these elements by a preponderance of the evidence, meaning "more likely than not." *Id.* at 442.

### A. Duty and Breach

The duty a physician owes a patient is based on "the standard of professional care." *Saunders*, 151 So. 3d at 441. "The standard of professional care is a level of care, skill, and treatment that, in consideration of all surrounding circumstances, is recognized as acceptable and appropriate by similar and reasonably prudent health care providers. In short, it is to provide the care that a reasonably prudent physician would provide." *Id.*

*1. Failing to order a CT Scan with contrast in October 2012*

Mr. Chiarino first contends that the standard of professional care required that, when Mr. Chiarino presented with hematuria in September 2012, he be evaluated for bladder cancer using (1) a CT scan with and without contrast, (2) a cytology, (3) and a cystoscopy. He contends Dr. Diaz and the VA breached the standard of care by failing to order a CT Scan with contrast.

Dr. Yun, Dr. Ammann, and Dr. Kava each testified that the standard of care includes ordering a CT Scan with contrast. Dr. Yun testified that a standard workup for hematuria included a CT Scan with contrast, particularly in light of Mr. Chiarino's history and propensity for bladder cancer. In referring to ordering a CT Scan both with and without contrast, Dr. Ammann testified, it is the way the "western world" performs workups for hematuria. The Government's own expert, Dr. Kava, conceded that the standard of care for cases such as this includes a CT scan with and without contrast. I find the standard of care required a CT scan with contrast. The evidence indicates that neither Dr. Diaz, nor anyone else at the VA, ordered a CT scan with contrast in October 2012. Thus, Mr. Chiarino established the VA breached the duty of care.

*2. Failing to follow up to ensure a cytology was actually conducted after it was ordered in October 2012*

Dr. Yun and Dr. Kava also agreed that the standard of care required ordering a cytology and following up to make sure it was actually conducted. The evidence indicates no one at the VA followed up to make sure the cytology was conducted. The failure to ensure the cytology was performed constituted a breach of the standard of care.

*3. Improperly identifying a tumor as a stone during the cystoscopy in November 2012*

A health care provider "has a duty to provide a proper diagnosis made after 'ascertaining a patient's medical condition through examination and testing.'" *Perez v. United States*, 883 F.

Supp. 2d 1257, 1286 (S.D. Fla. 2012) (quoting *Silva v. Sw. Florida Blood Bank, Inc.*, 601 So. 2d 1184, 1187 (Fla. 1992)). Mr. Chiarino, contends that Dr. Diaz misdiagnosed the tumor in November 2012 as a stone. Dr. Yun testified that Dr. Diaz should have known the tumor was not a stone, based on the previous CT scan without contrast and ultrasound, which both indicated no stones were present. The Government, based on Dr. Kava's testimony, contends that Dr. Diaz properly diagnosed exactly what was present—a stone in the bladder.

Here, Mr. Chiarino has not established by a preponderance of the evidence that what Dr. Diaz viewed during the cystoscopy was actually a tumor. According to Dr. Yun, bladder cancer is more likely to develop within diverticula. He testified that there was no stone to cause the hematuria. Dr. Yun concluded that the hematuria must have been caused by the tumor, which meant the tumor developed in September 2012. In addition, Dr. Yun testified that this tumor appears to have grown from the diverticula. He therefore believes that what Dr. Diaz identified as a stone was, in fact, the tumor.

However, Dr. Kava testified that a stone could cause hematuria. He explained that it is possible there was a stone in the diverticula and the CT scan in September and ultrasound simply did not identify it. Dr. Kava testified that hematuria could also have been caused by BPH. Moreover, Dr. Kava testified that the tumor did not necessarily come from the diverticula, but another portion of the bladder. Moreover, he testified that—had the tumor developed in September 2012 per Mr. Chiarino's theory—the tumor would have metastasized. This did not occur. Based on the testimony, I find that Mr. Chiarino did not establish Dr. Diaz misdiagnosed a tumor as a stone. There was, therefore, no breach of the duty of care during the cystoscopy in October 2012.

> 4. *Ongoing failure to follow up with a cytology, CT Scan with contrast, or a second cystoscopy during the months where Mr. Chiarino continued to have hematuria and progressively worse symptoms*

Mr. Chiarino claims multiple breaches of the standard of care based on the VA's ongoing failure to correct its past mistakes. Dr. Yun testified that the VA should have followed up after Mr. Chiarino continued to exhibit hematuria. Dr. Kava also agreed that he would have followed up with Mr. Chiarino after his hematuria did not clear up. Accordingly, Mr. Chiarino has established ongoing breach of the standard of care based on the VA's failure to order a CT scan with contrast or a cytology during the months leading up to the emergency room visit in March 2013.

> 5. *Misdiagnosing the tumor in March 2013.*

Dr. Yun and Dr. Kava disagreed regarding whether the CT Scan in March 2013 revealed the presence of a tumor. While both are esteemed urologists, neither is a radiologist. The only radiologist to testify was Dr. Ammann. Dr. Ammann was unequivocal that the CT scan indicated the presence of an abnormality. He also testified that the abnormality "absolutely" should have been presumed to be bladder cancer until proven otherwise by further testing. Dr. Stern did not identify the abnormality as a concern, but instead disagreed with the preliminary report without further testing to rule out the possibility of a tumor. Accordingly, Mr. Chiarino established a breach of the standard of care in misdiagnosing the tumor in March 2013.

**B. Causation**

To establish causation, "the plaintiff must show that what was done or failed to be done probably would have affected the outcome. And the plaintiff must do so without an impermissible stacking of inferences." *Santa Lucia v. LeVine*, No. 2D14-5011, 2016 WL

886384, at *4 (Fla. 2d DCA Mar. 9, 2016) (internal citations and quotations omitted).[5]

**The radical cystectomy and subsequent harm**. Mr. Chiarino contends that the delay in diagnosis caused him to have the radical cystectomy, and that the radical cystectomy caused harm, including: surgeries for bowel obstruction and hernias, incontinence, erectile dysfunction, ongoing pain, and a decrease in quality of life. In order to establish the causation element, he had to establish that, but for any of the breaches of the duty of care, he would not have had the radical cystectomy. He failed to meet this burden.

Mr. Chiarino's cancer was Stage III in June 2013. His only option at that time was a radical cystectomy. Mr. Chiarino presented two alternative treatment options that he claims were available had he been diagnosed at an earlier stage, TURBT and a partial cystectomy.

As to the TURBT, for that to have been a valid treatment option, Mr. Chiarino would have had to be a diagnosed at Stage I. There was no evidence presented that—when the breaches occurred—the cancer was Stage I as opposed to Stage II. The only evidence that the breaches occurred when the cancer was at an earlier stage was Dr. Diaz's description of the object he saw in the diverticulum in October 2012, and the timeline of when the tumor was removed in June 2013. Based on the size, Dr. Yun estimated the cancer was Stage I. However, this conclusion is speculative. It relies on Dr. Diaz's description, which Dr. Yun simultaneously attacks as being a misdiagnosis, and a fixed timeline of the tumor growth. Dr. Yun himself testified that tumor growth can be variable. Moreover, Dr. Kava testified that the tumor could not have existed in November of 2012, as it would have metastasized before the radical cystectomy occurred. Put

---

[5] As a threshold matter, I reject the Government's argument that Mr. Chiarino caused any of the harm. The Government argued Mr. Chiarino did not sign certain consent documents (evidencing a desire to avoid surgery), he did not want to follow up with Dr. Diaz after February, and he would not have had additional testing if presented with the option. This is not supported by the evidence, which indicates Mr. Chiarino did everything possible to try to get a proper diagnosis.

simply, it is unclear when the cancer first developed, and when it progressed between stages.

As to a partial cystectomy—still a possible treatment option for Stage II cancer—Dr. Kava testified that a partial cystectomy leaves the rest of the bladder at risk for recurrence of cancer. He also testified that—based on the location of the tumor near the ureter—a partial cystectomy would have been technically difficult and could lead to kidney destruction or bowel complications. Dr. Kava testified that most of his patients would have gone with a radical cystectomy—even if the cancer was Stage II. Mr. Chiarino did not establish that, given these potential complications and increased risk of recurrence, he would have elected a partial cystectomy had he been given the option. Finally, Mr. Chiarino did not establish the surgeries that occurred after the radical cystectomy—including the bowel obstruction and hernias—were caused by the radical cystectomy.

Mr. Chiarino did not establish what stage the cancer was in when the breaches occurred or that he would have elected an alternative to the radical cystectomy. Accordingly, he did not establish that the breaches caused him to have a radical cystectomy, or any harm that subsequently occurred.

**Survival rate**. Mr. Chiarino did not establish that any of the VA's breaches caused Mr. Chiarino a decreased survival rate. Mr. Chiarino has not had a recurrence of cancer for almost three years. Dr. Pizzolato testified that—at this point—Mr. Chiarino has had the best possible outcome for a bladder cancer diagnosis, regardless of the stage it could have been identified. The initial survival rates based on the stage of the cancer, therefore, do not represent survival rates as to Mr. Chiarino. As such, any damages based on the increased risk of cancer "are speculative based on the possibility that the cancer may reoccur in the future. A mere possibility of future causation is not enough . . . ." *Wroy v. N. Miami Med. Ctr., Ltd.*, 937 So. 2d 1116, 1118 (Fla. 3d DCA 2006) (affirming summary judgment for the defendant as to damages based on

17

decreased chance of survival). Here Mr. Chiarino has not established that a delay in diagnosis caused a reduced survival rate.[6]

**Pain and suffering**. Mr. Chiarino did, however, demonstrate that the breach of the duty of care caused him pain and suffering during the time the cancer unequivocally should have been caught on March 12, 2013, and when it was eventually discovered on May 23, 2013. Mr. Chiarino repeatedly insisted to the VA doctors and staff that he believed he had bladder cancer. Rather than receive treatment for the cancer, he was referred to a psychologist. Had the breach of duty not occurred, he most likely would have received the radical cystectomy at an earlier time. He may, therefore, recover for the pain and suffering caused by the delay.

In addition, a plaintiff may recover for the "emotional damages . . . as a result of [] increased fear of recurrence of cancer." *Swain v. Curry*, 595 So. 2d 168, 173 (Fla. 1st DCA 1992). Here, although Mr. Chiarino did not establish he presently has a higher likelihood of recurrence, he did show that, based on being diagnosed at Stage III, he was faced—at least initially—with the possibility of a more negative outcome as opposed to Stage I or II. In other words: at the time he was diagnosed by private physicians, Mr. Chiarino did not know he was going to have this successful of an outcome. He may therefore recover the emotional damages of facing a worse prognosis for the first two years following the diagnosis (the time in which the cancer was most likely to recur). Based on the pain and suffering caused by the delay in diagnosis, as well as the emotional harm stemming from his reduced predicted survival rate in the two years after the cystectomy, I award Mr. Chiarino $500,000.

---

[6] As I find Mr. Chiarino has not established causation as to survival rate, I need not address the Government's argument that the failure to have neoadjuvant chemotherapy before the radical cystectomy may have contributed to a reduced survival rate.

### III. CONCLUSION

The VA breached its duty of care to Mr. Chiarino. Although this breach was not shown to have resulted in a different prognosis or treatment, the delay in diagnosis caused Mr. Chiarino pain and suffering, as well as emotional damages. Accordingly, it is

**ORDERED AND ADJUDGED** that final judgment should be entered in favor of Joseph Chiarino and against the United States of America. Final Judgment will be entered by separate order.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 31 day of May, 2016.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to: counsel of record